UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARY ABBOTT,
Plaintiff,

-v-

Q4 US, LLC, a division of Q4 Inc.,
Defendant.

26-CV-2474 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Mary Abbott brings this action against her former employer, Defendant Q4 US, LLC ("Q4"), alleging that Q4 discriminated against her because of her age and disability in violation of the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act of 1990 ("ADA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). Abbott also brings claims for fraudulent inducement, intentional infliction of emotional distress ("IIED"), and defamation under New York state law. Q4 moves to dismiss the IIED and defamation claims for failure to state a claim. For the reasons that follow, the motion is granted.[1]

## I. Background

The following facts are drawn from the First Amended Complaint (ECF No. 37 ("Compl.")) and are presumed true for purposes of resolving Q4's motion to dismiss. *Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

[1] After briefing concluded on Q4's motion to dismiss, Abbott moved to disqualify Q4's counsel, Ned H. Bassen, alleging that Bassen and his law firm, Dentons US LLP, are witnesses to Abbott's defamation claim. (ECF No. 52.) Because the Court dismisses Abbott's defamation claim for failure to state a claim, Abbott's motion to disqualify counsel is denied as moot.

### A. Factual Background

In December 2022, a recruiter reached out to Abbott to gauge her interest in becoming the Senior Vice President of Finance at Q4, a software development company. (Compl. ¶¶ 5, 32.) In that position, Abbott was told, she would be "groomed" to take over as Q4's Chief Financial Officer ("CFO") once the then-CFO, Donna de Winter, retired. (*Id.* ¶ 32.)

Abbott accepted the role and began working for Q4 on February 27, 2023. (*Id.* ¶¶ 26, 43.) For the next few months, Abbott performed well. (*Id.* ¶¶ 44-45.) She "built a good rapport" with her colleagues, received positive feedback from her supervisors, and was "fast becoming known as a problem solver" in Q4's Finance division. (*Id.* ¶¶ 44-46, 61.)

Then something changed. During the summer of 2023, Abbott learned that she needed a major surgery to correct congenital deformities in her spine. (*Id.* ¶ 64.) Recovery from that surgery would take at least twelve weeks, during which Abbott would need to attend regular physical therapy sessions and take "multiple medications"; for six weeks of that recovery period, Abbott would also need to wear a "hard cervical collar" for "24 hours a day, 7 days a week." (*Id.* ¶ 65.)

During conversations with de Winter and various members of Q4's Human Resources team, Q4 "agreed to accommodate" Abbott's post-surgery recovery needs. (*Id.* ¶¶ 75-80.) In practice, however, Q4 did not do so. (*Id.* ¶ 80.) Q4 gave Abbott fifteen days off of work to recover from the surgery—not the twelve weeks her surgeon had recommended. (*Id.* ¶ 72.) Q4 employees continued to "slack message, email, and call" Abbott about "non-critical" matters during the evenings and on weekends. (*Id.* ¶¶ 80, 89, 95.) Others scheduled meetings over the physical therapy appointments or rest breaks on her calendar. (*Id.* ¶¶ 88, 150.)

Two months after the surgery, on November 6, 2023, Abbott was told that she was no longer being considered to replace de Winter as Q4's next CFO. (*Id.* ¶¶ 99-101.) Thereafter,

Abbott's relationship with Darrell Heaps, Q4's Chief Executive Officer ("CEO"), turned "hostile." (*Id.* ¶¶ 84-87, 119, 122.) Heaps blamed and "berat[ed]" Abbott for mistakes attributable to outdated revenue reporting systems that predated her tenure at Q4. (*Id.* ¶ 226; *see also id.* ¶¶ 46-49, 54-56.) He left her out of important meetings with the company that was acquiring Q4 while including younger employees. (*Id.* ¶¶ 120-122.) He placed her on an unwarranted performance improvement plan ("PIP")—at first, because he claimed she had made "inappropriate comments" about Q4 to the company's external vendors, and later, because he claimed she had "harass[ed]" and been "violen[t]" toward other employees on her team. (*Id.* ¶¶ 127-134.) He informed her that she would receive only half of her annual bonus because of that PIP—even after the allegations against her turned out to be "unfounded." (*Id.* ¶¶ 182-183, 216, 221.) He gave Abbott her first negative quarterly performance review. (*Id.* ¶¶ 223-224.) He selected Leslie Lewis Westhaver, a "substantially younger" and "less qualified" candidate, as Q4's new CFO. (*Id.* ¶¶ 189-191.) And once Westhaver began working at Q4 on April 1, 2024, Heaps transferred many of Abbott's job responsibilities to her. (*Id.* ¶¶ 231, 234.)

Abbott's relationship with Westhaver quickly became "hostile," too. (*See id.* ¶ 207.) Westhaver reprimanded Abbott for "interrupting her" in meetings and scheduled meetings with Abbott's team when she knew Abbott would be attending doctor's appointments. (*Id.* ¶¶ 242, 247.) She asked to be copied on every email Abbott sent, even though she did not require the same of her younger direct reports. (*Id.* ¶ 258.) She transferred Abbott's job responsibilities to other, younger employees when Abbott complained about her management style. (*Id.* ¶¶ 253-256, 269-271.) And she "glar[ed]" at Abbott when she walked by her in the office. (*Id.* ¶ 292.)

On May 8, 2024, fifteen months after she began working at Q4, eight months after her spinal surgery, and one month after Westhaver became Q4's new CFO, Abbott scheduled calls

with Q4's Chief People Officer and Chief Operating Officer. (*Id.* ¶ 299.) She intended to use those calls to file official complaints against Heaps and Westhaver. (*Id.* ¶¶ 299, 304.) She was fired three hours before they were scheduled to begin. (*Id.* ¶¶ 306-310.)

### B. Procedural History

Abbott filed suit in this Court on March 25, 2026 (ECF No. 1) and filed an amended complaint on July 13, 2026 (ECF No. 37). On July 24, 2026, Q4 filed a motion to dismiss the IIED and defamation claims in Abbott's amended complaint (ECF No. 43), along with an accompanying memorandum of law (ECF No. 45 ("Mem.")). Abbott filed an opposition to Q4's motion on August 5, 2026 (ECF No. 46 ("Opp.")), and Q4 filed its reply on August 12, 2026 (ECF No. 48 ("Reply")).

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the complaint must be dismissed. *Twombly*, 550 U.S. at 558.

## III. Discussion

Q4 does not contest Abbott's ADA, ADEA, NYSHRL, NYCHRL, or fraudulent inducement claims at this juncture. Instead, Q4 argues that the Court should dismiss Abbott's IIED and defamation claims for failure to state a claim. (*See generally* Mem.) The Court agrees.

### A. IIED Claim

To plead a claim for intentional infliction of emotional distress under New York law, a plaintiff must allege: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quotation marks omitted).

IIED is a "highly disfavored tort" under New York law. *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) (cleaned up). As a result, the standard for the first and arguably most important element—extreme and outrageous conduct—is "strict, rigorous and difficulty to satisfy." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019) (quoting *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (1st Dep't 2018)). The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (1993)).

Of course, some actions taken in the workplace can be sufficient to surpass the outrageous conduct element's high bar and, in turn, state a claim for IIED. *See Howell*, 81 N.Y.2d at 125. Allegations of physical and sexual assaults in the workplace are usually enough to do so. *See Ibraheem v. Wackenhut Servs., Inc.*, 29 F. Supp. 3d 196, 215 (E.D.N.Y. 2014). Allegations that a supervisor ignored years of racial slurs and "death threats" levied at an employee by their colleagues—and actively thwarted a police investigation into those threats—can be, too. *See Turley*, 774 F.3d at 146-47, 161. But allegations of "[i]nsults, bullying, and general harassment" in the workplace usually are not enough to state an IIED claim. *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 535 (S.D.N.Y. 2015). And even the most severe of

Abbott's allegations—for example, that she was harshly reprimanded in meetings, encouraged to work long hours while experiencing physical pain from her spinal surgery, placed on a PIP based on false complaints from her subordinates, passed over for a promotion she was initially promised, and ultimately fired the day she intended to file official complaints against her bosses—constitute the kinds of workplace hostility or harassment or bullying that, considered individually or collectively (*see* Opp. at 6, 17), are not "so beyond the pale as to reach the extreme threshold necessary for an IIED claim." *See Turley*, 774 F.3d at 161; *see also Lydeatte v. Bronx Overall Econ. Dev. Corp.*, No. 00-CV-5433, 2001 WL 180055, at *2 (S.D.N.Y. Feb. 22, 2001). The Court must dismiss Abbott's IIED claim accordingly.

**B. Defamation Claim**

Q4 also argues that this Court should dismiss Abbott's defamation claim. That claim arose out of a series of LinkedIn messages that Abbott sent to one of her former colleagues in the months after she was fired. In brief, on October 6, 2024, after Abbott found out that Heather Murray, Q4's former Assistant Vice President of Financial Planning and Analysis, was one of the two people who had accused her of harassment, Abbott sent Murray a LinkedIn message expressing "disappoint[ment]" about Murray's involvement in her termination and demanding that Murray "cease and desist from disparaging [her] and negatively impacting [her] career." (Compl. ¶¶ 38, 313; *see also* ECF No. 44-2 at 4-5.) If Murray did not, Abbott warned that she would "pursue legal damages against [Murray] personally." (Compl. ¶ 313, *see also* ECF No. 44-2 at 5.)

Six months later, Q4 sent a letter to Abbott through its counsel suggesting that her LinkedIn messages to Murray could amount to witness tampering in violation of 18 U.S.C. § 1512(b). (*Id.* ¶ 315; *see also* ECF No. 44-2 at 2.) Q4 made a similar "witness tampering" allegation—again through counsel—in a public filing in a related state-court proceeding. (ECF

No. 57-8 at 7.) Abbott, for her part, insisted that the witness tampering allegations were "libelous" and sent Q4 multiple letters demanding that they "cease and desist" from making them. (Compl. ¶¶ 322, 328.) Abbott also brings a defamation claim against Q4 in this action based on those same allegations. (*Id.* ¶¶ 419-431.)

"Libel is a method of defamation expressed in writing or print." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). To state a claim for defamation under New York law, a plaintiff must allege that the defendant (1) made a "defamatory statement" and (2) "published [it] to a third party" with (3) "the applicable level of fault," thus (4) "causing special damages or qualifying as defamation *per se*." *Bobulinksi v. Tarlov*, 758 F. Supp. 3d 166, 172-73 (S.D.N.Y. 2024) (quoting *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011)). A defamatory statement is one that is both "false" and that "tends to expose a person to public contempt, hatred, ridicule, aversion[,] or disgrace." *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014). Whether or not a statement is defamatory is "a legal question to be resolved by the courts in the first instance." *Celle*, 209 F.3d at 177 (alteration adopted) (quoting *Aronson v. Wiersma*, 65 N.Y.2d 592, 593 (1985)).

Abbott contends that Q4's suggestion that she had engaged in witness tampering is defamatory because, among other reasons, the LinkedIn message giving rise to those allegations "does not deter [Murray] from participating as a witness but rather invites her to come to court and testify," and Murray has never expressed that she felt "threatened or intimidated" as a result of that message. (Opp. at 23 & n.7.) Q4 insists that that calling Abbott's messages "witness tampering" was not defamatory because that statement was "substantially true." (Reply at 6.) But the Court need not decide whether Abbott's LinkedIn messages actually amounted to

criminal witness tampering because, regardless, Q4's statements about them are protected by the litigation privilege.

The litigation privilege attaches to statements made by attorneys "in connection with" judicial proceedings. *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015). It prevents those statements from being used as the basis for a defamation action. *Id.* The point of the privilege is to allow "those discharging a public function"—that is, attorneys—to "speak freely [in order] to zealously represent their clients without fear of reprisal or financial hazard." *Id.* As a result, the privilege's definition of "judicial proceedings" is expansive. It covers not only court but also quasi-judicial agency proceedings—for example, those conducted by the Equal Employment Opportunity Commission ("EEOC") or similar state agencies. *See Bernstein v. Seeman*, 593 F. Supp. 2d 630, 636 (S.D.N.Y. 2009). Additionally, the threshold for what counts as a statement made "in connection with" those proceedings is a low one. In short, the privilege covers "*anything* that may possibly or plausibly be relevant or pertinent" to judicial or quasi-judicial proceedings. *O'Brien v. Alexander*, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) (Chin, J.) (emphasis added) (quoting *Grasso v. Mathew*, 564 N.Y.S.2d 576, 578 (3d Dep't 1991)).

Applying that standard, it is clear that the statements giving rise to Abbott's defamation claim are protected by the litigation privilege. The "witness tampering" allegations were made by Q4's counsel—first, in a letter addressed to Abbott's counsel, and later, in a petition filed during a related state-court proceeding. (*See* ECF No. 44-2 at 2; ECF No. 57-8 at 7.) They concern Abbott's post-termination contact with at least one adverse witness to her employment discrimination claims. (Again, Murray was one of two employees who filed grievances against Abbott which, Abbott contends, were used as a "pretext" to place her on a PIP and then fire her. (Compl. ¶¶ 133-135, 313; *see also* ECF No. 44-2 at 4.)) And the allegations, when made, thus

were or could have been or could have become "material or pertinent" to the ongoing EEOC and New York state-court proceedings investigating those discrimination claims. *See Kelly v. Albarino*, 485 F.3d 664, 666 (2d Cir. 2007). Those allegations thus cannot give rise to a defamation claim.

## IV. Conclusion

For the foregoing reasons, Q4's motion to dismiss Abbott's IIED and defamation claims is GRANTED. Abbott's motion to disqualify Q4's counsel is DENIED as moot.

Q4 shall file an answer to the remaining claims within 14 days after the date of this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 43, 50,[2] and 52.

SO ORDERED.

Dated: November 5, 2026
New York, New York

J. PAUL OETKEN
United States District Judge

[2] Q4's letter motion for leave to file a document on the record (ECF No. 50) has since been withdrawn by counsel (ECF No. 54).